# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| CAPITALPLUS EQUITY, LLC,<br><br>                Plaintiff,<br>v.<br><br>GLENN RIEDER, INC.,<br><br>                Defendant and<br>                Third-Party Plaintiff,<br>v.<br><br>THE ESPINOSA GROUP, INC.,<br><br>                Third-Party Defendant. | Case No. 17-CV-639-JPS<br><br><br><br><br>**ORDER** |

      This case arises from payments allegedly remitted to the wrong entity. Specifically, CapitalPlus Equity, LLC ("CapitalPlus") claims that it purchased accounts receivable owed by Glenn Rieder, Inc. ("Glenn Rieder") to The Espinosa Group, Inc. (the "Espinosa Group"). Despite receiving notice of the sale, Glenn Rieder remitted several payments, totaling almost $200,000, to the Espinosa Group. CapitalPlus has sued Glenn Rieder for breach of the contract, and Glenn Rieder has joined the Espinosa Group as a third-party defendant, arguing that it is liable for any mistaken payments. Before the Court are the primary parties' competing requests for summary judgment. For the reasons stated below, the Court is unable to grant judgment as a matter of law to either side.

1.  **LEGAL STANDARD**

Federal Rule of Civil Procedure 56 provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). The court must not weigh the evidence presented or determine credibility of witnesses; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010).

2.  **RELEVANT FACTS**

Glenn Rieder used the Espinosa Group as a subcontractor for several building projects. It owed money to the Espinosa Group in the form of accounts receivable. The Espinosa Group thereafter entered into a financing agreement, also called a "factoring agreement," with CapitalPlus. The agreement provided two financing alternatives. First, the Espinosa Group could "factor," or assign, its accounts receivable to CapitalPlus. Second, it could obtain payroll advances.

CapitalPlus alleges that the Espinosa Group sold it two Glenn Rieder accounts in October 2016. It relies on a declaration signed by

Michael Espinosa ("Espinosa"), President and CEO of the Espinosa Group, on July 24, 2017. (Docket #19-1). In the declaration, Espinosa averred that while some accounts sold to CapitalPlus were identified in written schedules, others were identified and agreed to through e-mails and other informal communications between the companies. *Id.* ¶ 4. He further stated that the two Glenn Rieder accounts at issue here "[were] sold and assigned to CapitalPlus by [the Espinosa Group] pursuant to the Factoring Agreement on or about October 1, 2016." *Id.* ¶ 7.

Glenn Rieder disagrees, noting that at Espinosa's October 30, 2017 deposition—which occurred after CapitalPlus filed its motion for summary judgment—he recanted his averments. At the deposition, Espinosa testified that any account assigned to CapitalPlus was always documented on written schedules executed weekly between the Espinosa Group and CapitalPlus. He rejected the notion that the parties used informal methods such as e-mail to identify accounts that were sold. His view is corroborated by the factoring agreement itself, which provides that accounts sold must be recorded in a bill of sale. The agreement states, in pertinent part:

> Purchased Accounts. [The Espinosa Group] from time to time may offer Accounts to [CapitalPlus] for purchase. [The Espinosa Group] shall sign and submit to [CapitalPlus] a Schedule of Purchased Accounts form which constitutes a Bill of Sale for the invoices representing the Accounts offered for purchase by [CapitalPlus] and agreed to be considered Acceptable Accounts by [CapitalPlus]. [CapitalPlus] may also require other supporting documentation for such invoices as special circumstance arise. [CapitalPlus] may purchase from [the Espinosa Group] such Acceptable

Accounts as [CapitalPlus] elects. All purchases shall be subject to the terms and conditions of this Agreement.

(Docket #23-1 ¶ 2). No bill of sale memorializes the sale of any Glenn Rieder account.

Furthermore, Espinosa testified that there are several instances of the Espinosa Group receiving payroll advances from CapitalPlus under the factoring agreement, and it used two checks from Glenn Rieder to help pay back those advances. According to him, the Espinosa Group sent frequent e-mails to CapitalPlus requesting payroll advances, and some of those payroll advances mention the two projects the Espinosa Group worked on for Glenn Rieder. But he maintains that mere mention of the accounts in emails did not amount to assignment, which had to be formalized.

Espinosa thus testified that the facts set forth in his July 24, 2017 declaration are incorrect, that he did not read the declaration prior to signing it, and he never would have signed the declaration if he had read it. Espinosa signed the declaration as it was sent to him by Scott Applegate ("Applegate") of CapitalPlus, after a lunch meeting in New York City. At that meeting, Applegate told Espinosa that this case had settled, and that Applegate was going to send Espinosa a document for him to sign as part of that settlement, so that the unions could get paid. When Applegate sent the proposed declaration to Espinosa, it had no exhibits attached to it. Espinosa signed it without reading it and sent it back to Applegate. Espinosa did not attach any exhibits to the declaration before sending it back to Applegate.

In reply, CapitalPlus contends that whether Espinosa's affidavit or deposition testimony is believed, it is uncontroverted that the factoring agreement gave it a security interest in the Glenn Rieder accounts. (Docket #23-1 ¶ 13). Pursuant to the agreement, the Espinosa Group granted CapitalPlus a security interest in "all assets" of the company. *Id.* These assets specifically included "all Accounts" of the Espinosa Group. *Id.*; (Docket #23-3 ¶ 1). This, in CapitalPlus' view, included the Glenn Rieder accounts. CapitalPlus contends its security interest is enforceable in the same manner and degree as an outright assignment.

On October 13, 2016, CapitalPlus and the Espinosa Group jointly sent a notice of assignment to Glenn Rieder, notifying it that the Espinosa Group had assigned all present and future accounts of Glenn Rieder to CapitalPlus and that all payments due to the Espinosa Group now or in the future must be made directly to CapitalPlus. However, Glenn Rieder says that the notice was false. In support, Glenn Rieder observes that the notice was a generic form that was signed in blank by Espinosa. The Notice is not addressed to Glenn Rieder, but instead is addressed to "Dear Accounts Payable Manager." (Docket # 19-5). Espinosa testified that he had no advance knowledge that CapitalPlus was going to send the Notice to Glenn Rieder. He testified that CapitalPlus was not authorized to send the notice to Glenn Rieder; it was sent solely by CapitalPlus without his consent.

Whether authorized or not, Glenn Rieder does not dispute that it received the notice. Following receipt of the notice, in December 2016, Glenn Rieder delivered to CapitalPlus two checks with the notation "FOR

ACCOUNT: ESPINOSA GROUP[.]" The checks were made out to the Espinosa Group. Glenn Rieder explains that it sent the checks directly to CapitalPlus at the Espinosa Group's request to help expedite its repayment of payroll advances. Espinosa testified to this effect at his deposition.

On or about January 20, 2017, Glenn Rieder remitted a check in the amount of $55,803.88 directly to the Espinosa Group for amounts related to one of the relevant accounts. Next, during February 2017, Glenn Rieder made a payment of approximately $143,895 directly to the Espinosa Group related to the other relevant account.

3.   **ANALYSIS**

CapitalPlus' motion seeks a ruling that Glenn Rieder has paid the wrong entity. At first, the question seems quite straightforward, as neither party disputes the applicable law. Under the Uniform Commercial Code, which exists in materially identical form in all states mentioned in the relevant contracts, an account debtor such as Glenn Rieder

> may discharge its obligation by paying the assignor until, but not after, the account debtor receives a notification, authenticated by the assignor or the assignee, that the amount due or to become due has been assigned and that payment is to be made to the assignee. After receipt of the notification, the account debtor may discharge its obligation by paying the assignee and may not discharge the obligation by paying the assignor.

*See* Wis. Stat. § 409.406. "Thus, where an account debtor receives notification of assignment but nonetheless pays only the assignor, the account debtor remains obligated in full under the contract, and upon the

assignor's default, the assignee may enforce the account debtor's contractual obligations." *Reading Coop. Bank v. Suffolk Constr. Co.*, 984 N.E.2d 776, 782 (Mass. 2013). This UCC provision "requires an account debtor that has received a notice of assignment to pay the assignee in order to discharge its contractual obligation to the assignor." *Durham Commer. Capital Corp. v. Select Portfolio Servicing, Inc.*, Case No. 3:14-cv-877-J-34PDB, 2016 WL 6071633, at *21 (M.D. Fla. Oct. 17, 2016). According to CapitalPlus, Glenn Rieder remains indebted to it and cannot receive credit for payments inadvertently remitted to the Espinosa Group.

But Glenn Rieder says that no assignment was ever made, and thus no payments were ever due CapitalPlus. It relies upon the "sham affidavit" rule, asking the Court to disregard Espinosa's July 2017 declaration and credit his testimony during his October 2017 deposition. The sham affidavit rule prohibits litigants from manufacturing issues of fact with affidavits that contradict their prior sworn testimony. *Janky v. Lake Cnty. Convention & Visitors Bureau*, 576 F.3d 356, 362 (7th Cir. 2009). Otherwise, the ability of a court on summary judgment to "weed out unfounded claims, specious denials, and sham defenses—would be severely undercut." *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168–69 (7th Cir. 1996). Consequently, "[w]here a deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 67–68 (7th Cir. 1995).

At first blush, the sham affidavit rule seems appealing in a case like this one. CapitalPlus makes no effort to refute the allegation that Applegate cajoled Espinosa into signing an affidavit without reading it on the false representation that it would make the case against him disappear. Having explained himself more clearly in the deposition, it would seem prudent to credit Espinosa's oral sworn testimony over the sworn statements in the affidavit.

But the Court must recall its limited role during summary judgment. It cannot resolve disputes of fact or decide what testimony is more credible. *Berry*, 618 F.3d at 691. The key to the sham affidavit rule is not the form of the sworn statement—*i.e.*, affidavit versus deposition—but the timing of the statements. *Bank of Illinois* and the cases cited therein uniformly involve a witness trying to contradict an earlier sworn statement with a later one. *See Bank of Ill.*, 75 F.3d at 1169. The nature of each statement is immaterial. What matters is that the witness' earlier statement must stand unless he can adequately explain why his more recent statement is necessary. *Id.* In such cases, it is the later statement that must be disregarded, if any.[1]

---

[1] The Seventh Circuit in *Russell* also expressed general skepticism of affidavits drafted by lawyers as opposed to a witness' own statements at a deposition. *Russell*, 51 F.3d at 67–68; *see also Harris v. Owens-Corning Fiberglass Corp.*, 102 F.3d 1429, 1432 (7th Cir. 1996). But in every case the Court could locate applying the sham affidavit rule, including those cited by *Russell*, there existed the temporal distinction between earlier and later statements, a competition between which must be resolved in favor of the former. *See, e.g., Slowiak v. Land O'Lakes, Inc.*, 987 F.2d 1293, 1297 (7th Cir. 1993); *Adelman-Tremblay v. Jewel Cos.*, 859 F.2d 517, 520–21; *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 861–62 (7th Cir. 1985). That was the case in *Russell*, too, *Russell*, 51 F.3d at 68, and although the Seventh Circuit has at times displayed a preference for deposition testimony, this

Thus, the Court cannot, as Glenn Rieder requests, reject Espinosa's affidavit under this rule. It could only reject the deposition testimony. But CapitalPlus does press the Court to do so. While it claims that the deposition testimony is "false," CapitalPlus does not cite the sham affidavit rule at all. (Docket #23 at 2). The Court cannot discount the deposition testimony on the bare assertion that it is false or self-serving. *Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013).

As a consequence, the Court is left with a genuine dispute as to the central issue in the case: whether the Glenn Rieder accounts were in fact sold to CapitalPlus. On the one hand, the factoring agreement itself never effected the sale of any accounts. It provided that sales could be made if agreed between the parties and reflected in a bill of sale. *See* (Docket #21 at 10). Yet there is no formal documentation of the sale of the Glenn Rieder accounts. On the other hand, CapitalPlus has Espinosa's affidavit, which suggests that informal assignments were not impermissible and that this is how the Glenn Rieder accounts were sold. This dispute is critical, as the notice CapitalPlus sent to Glenn Rieder demanding payment would have no force or effect unless the accounts had actually been assigned to it. *Forest Capital, LLC v. BlackRock, Inc.*, 658 F. App'x 675, 681 (4th Cir. 2016); *Platinum Funding Servs., LLC v. Petco Insulation Co.*, No. 3:09CV1133 MRK, 2011 WL 1743417, at *9 (D. Conn. May 2, 2011); *Durham*, 2016 WL 6071633,

---

cannot, standing alone, undermine the vast body of case law that confines the sham affidavit rule to its temporal underpinnings. *See In re 3RC Mech. & Contracting Servs., LLC*, 505 B.R. 818, 826 (Bankr. N.D. Ill. 2014) ("[T]he timing of the contradictory statement matters at least as much as the inherently greater reliability of live deposition testimony over sworn statements in writing prepared by attorneys.").

at *16. This question must be answered by the finder of fact. *See In re 3RC*, 505 B.R. at 826.[2]

In response to this new circumstance, CapitalPlus does not concede the existence of a triable issue of fact. Instead, it changes its tune: rather than claim the rights of an assignee of the accounts, it now relies on the fact that the agreement gave it a security interest in the accounts, which it says is enforceable to the same degree as an assignment. (Docket #23 at 2). What CapitalPlus does not provide, however, is citation to a single legal authority substantiating its claim that its rights as a secured party are coextensive with its rights had it been an assignee. In fact, CapitalPlus first tries to cover up this fatal flaw in its reasoning, blithely citing the same UCC cases it did in its opening brief without acknowledging that they pertain only to assignees of accounts. *See* (Docket #23 at 7–8). Notably, UCC section 9–406 only forces the account debtor to pay an "assignee," not a holder of a security interest, upon proper notification. Wis. Stat. § 409.406(1).

Because of this, CapitalPlus claims that another UCC provision, Wis. Stat. § 409.607, authorizes it, as a secured party, to gain the right to payment on an account after notice to the account debtor. (Docket #23 at 7–8). What it conveniently leaves out, however, is the prefatory clause of that section. As Glenn Rieder explains in its sur-reply—leave for which will be granted—a secured party's right to payment under UCC Section 9-

---

[2]The dispute about whether the notice to Glenn Rieder was authorized by the Espinosa Group is immaterial. If CapitalPlus truly owned the accounts, it would not need the assignee's permission to demand payment from the account debtor. Wis. Stat. § 409.406(1) (the notification may be "authenticated by the assignor *or* the assignee") (emphasis added).

607 is predicated on an express agreement permitting security interest holders to demand payment or a default on the account. (Docket #25-1 at 2–4); Wis. Stat. § 409.607(1)(a). There has been no allegation, much less evidence, of either circumstance in this case, and thus long-standing UCC principles did not permit CapitalPlus to transform its security interest into a right to immediate payment. In other words, this was not a right that CapitalPlus could simply exercise. To be sure, the requisite conditions precedent were not met.

Not only does CapitalPlus' argument not comport with the law, it makes no sense. Assuming CapitalPlus is correct, then because the factoring agreement gave it a security interest in all Espinosa Group accounts, it could have taken the Espinosa Group's right to payment for *any* account simply by giving notice to the account debtor. This is wholly at odds with the factoring agreement, which sets out detailed protocols for assigning rights in accounts receivable, and with the UCC, which limits the rights of secured parties as compared to assignees. As a result, CapitalPlus' argument does not carry the day, nor does it dispel the need for a jury to decide the ultimate question of whether the Glenn Rieder accounts were actually assigned to it.

## 4. CONCLUSION

Having run into a genuine dispute of fact as to whether it bought the Glenn Rieder accounts at issue in this case, CapitalPlus should have stopped there. It nevertheless pressed forward, adopting a wholly unsupported interpretation of its UCC rights.

Finally, the Court notes that Glenn Rieder in its opposition brief asked the Court to grant it summary judgment under Federal Rule of Civil Procedure 56(f)(1). (Docket #21 at 13–14). That Rule permits summary judgment to be entered in favor of a non-movant if the party against whom judgment will be entered was given notice and a reasonable time to respond. Fed. R. Civ. P. 56(f)(1). This consideration together with the matter of Espinosa's credibility and the conflict between his sworn statements means that summary judgment is not appropriate in favor of either party.

Accordingly,

**IT IS ORDERED** that Plaintiff's motion for summary judgment (Docket #17) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Defendant's motion for leave to file a sur-reply (Docket #25) be and the same is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that Defendant's request for summary judgment pursuant to Rule 56(f)(1) (Docket #21) be and the same is hereby **DENIED**.

Dated at Milwaukee, Wisconsin, this 3rd day of January, 2018.

BY THE COURT:

_____
J.P. Stadtmueller
U.S. District Judge